Joseph Fritsch, on Behalf of Himself and All Members of Brotherhood of Painters, Decorators and Paperhangers of America, of District Council No. 9 for the Boroughs of Manhattan and The Bronx, Plaintiff, *v.* Martin Rarback, Individually, et al., Defendants.

Supreme Court, Special Term, New York County, May 24, 1950.

*Solomon Surowitz* for plaintiff.

*G. Rifkin* for defendants.

BREITEL, J. Plaintiff, a member of a labor union, brings this representative action to have declared as null and void a referendum conducted within the local unions comprising District Council No. 9 of the Brotherhood of Painters, Decorators and Paperhangers of America. The referendum involves a proposed amendment of the by-laws of the district council and purported to extend the term of office of its secretary-treasurer from one to two years. Plaintiff claims that the referendum was illegal because it was not conducted by secret ballot as required by the Brotherhood Constitution. In addition to setting aside the referendum, and as a necessary consequence thereof, plaintiff seeks the mandate of an election for the office of secretary-treasurer, to be held in June, 1950.

The court finds that the defendants are entitled to judgment on the affirmative defense of laches, but because some of the issues involve matters of serious consequence to the membership of an important union, it is desirable to discuss and pass upon those issues affecting the exercise of the privilege of voting within the union. It is particularly desirable because of the improprieties and irregularities which occurred in the conduct of the referendum involved in the instant case.

The brotherhood and its constituent local unions, district councils and subordinate bodies is a voluntary, unincorporated association affiliated with the American Federation of Labor. District Council No. 9 is a labor union of painters and paperhangers in the boroughs of Manhattan and the Bronx. The council is composed of twelve local unions.

Prior to December 1, 1948, the by-laws of the district council provided for an annual election of a secretary-treasurer during the month of June for a term of one year. The secretary-treasurer is the chief officer of the district council and its constituent local unions. During the month of November, 1948, there was submitted to each of the local unions a referendum phrased as follows: " Shall the Secretary-Treasurer of the Council be elected by the members of the affiliated local unions

for a term of two (2) years?'' The result of the referendum was declared to be 1,818 votes in favor of the affirmative on the referendum and 1,420 for the negative. In all but three of the local unions the ballot was concededly '' open '', namely, by a showing of hands. In two of the local unions the evidence established full implementation for the conduct of a secret ballot, although there was evidence which tended to show that some voters had been improperly influenced as to how they should vote. In the last of the local unions, Local Union No. 1456, although there were paper ballots used, the evidence satisfied the court that there was insufficient opportunity or implementation for the exercise of a secret ballot. In June, 1949, six months later, an election was held among the same local unions of District Council No. 9 for the office of secretary-treasurer for a two-year term ending June 30, 1951. The election was, in accordance with the practice of the union, conducted by voting machines.

Plaintiff claims that the referendum was illegal because it was not conducted by secret ballot and that, therefore, the effect of the election in June, 1949, was merely to elect the defendant Rarback as secretary-treasurer for the term of one year and not for the term of two years. Defendants claim that the referendum was valid. In the alternative it is claimed that the affirmative votes of those validly cast constituted a majority and that, therefore, under the constitution the affirmative in the referendum prevailed.

The constitution of the brotherhood provides in section 100:

'' Sec. 100. (a) Any referendum, whether it pertains to elections, amendments to the constitution or other subject or question, must be voted upon in the following manner and no other method can be substituted for the same.

'' (b) The vote must be conducted by each separate local at a separate meeting of the local and among the members of each separate local. The vote shall be by secret ballot and shall be held at a special meeting of the local. The secretary of the local is required to send out special notices to each member of the local, advising him of the day, time and place where the special meeting will be held and that such meeting is being called for the purpose of voting on a question submitted to a referendum. A vote conducted by a combination of locals or groups or in any other manner than above specified, shall be null and void, and all of the votes cast by such groups or combinations of locals shall be thrown out and not counted.''

Sections 244 and 245 of the constitution provide:

" Sec. 244. By-laws for the government of district councils must be submitted by the district council to the local unions represented in said district council and to become law must receive a majority of the votes of the members present and voting. Two copies of the same shall be filed with the G. S.-T. for submission to the General Executive Board, one to be returned as approved or corrected, the other to be filed at the General Office for reference.

" Sec. 245. All changes in the by-laws, working rules or capitation tax of district councils must be submitted to the referendum and to become law must receive a majority of the votes of the members present and voting in the affiliated locals and must be submitted to the General Executive Board for approval, in duplicate, as provided in Section 244."

Since the referendum in question involved the government of the district council and was designed to and, did purport to amend the by-laws of the district council, it must have been submitted to the members of the local unions in accordance with the provisions above set forth. Consequently, the referendum must have been by " secret ballot ". Section 100 is clear and explicit and the mandate that the referendum be conducted by secret ballot may not be ignored (see *Waldman* v. *Ladisky,* Sup. Ct., N. Y. Co., Jan. 12, 1950, WALTER, J.).

" The constitution and by-laws of an unincorporated association express the terms of a contract which define the privileges secured and the duties assumed by those who have become members " (*Polin* v. *Kaplan,* 257 N. Y. 277, 281 [1931]). In the case of a labor union the same principle is, of course, applicable, and the constitution and by-laws define the relations of the union and its members and the rights of the members (*O'Keefe* v. *Local 463 of Assn. of Plumbers,* 277 N. Y. 300, 304 [1938]).

It is immaterial that a long-established custom and usage may have prevailed in District Council No. 9 in conducting referenda by open ballot. In fact, it appears that such custom prevailed for some years prior to the instant referendum. Custom and usage may not affect the written constitution or by-laws of an unincorporated association or local union (*Carey* v. *International Brotherhood of Paper Makers,* 123 Misc. 680, 206 N. Y. S. 73, 81 [1924]; see *Waldman* v. *Ladisky,* Sup. Ct., N. Y. Co., Jan. 12, 1950, *supra,* and Dangel & Shriber on Labor Unions [1941], p. 137).

Thus it follows that the referendum in the instant case was conducted in violation of the constitution of the brotherhood. (*Matter of Brunone* v. *Societa,* 254 App. Div. 753 [2d dept., 1938].)

Defendants urge, as indicated earlier, that if the referendum was invalid in nine or ten of the local unions, it was validly conducted in two of the local unions, namely, Local 1011 and Local 442, and then if the affirmative on the question prevailed in these two local unions, the question submitted on referendum had been validly approved in the affirmative by a majority vote of those '' present and voting '' in the two local unions. This argument depends upon the complete exclusion of illegal votes in accordance, it is claimed, with subdivision b of section 100 of the brotherhood constitution above set forth. It also depends upon the construction of section 245 of the brotherhood constitution as excluding from the terms '' members present and voting '' all those who participated in an illegal vote. Such a construction the court cannot accept. The terms '' members present and voting '' must be regarded in their usual acceptation as including all those members present and who have purported *to vote.* Certainly, no one could reasonably argue that the voter of an improperly marked ballot, or a coerced ballot, should not be included in determining whether or not a majority of the votes of those '' present and voting '' has been obtained. Any other result would put a premium upon the deliberate invalidation of the voting in local unions where the prevailing administration did not believe it could succeed and leave only for valid balloting those local unions where the administration position was deemed '' safe ''.

Courts have the power and the duty to construe the constitutions and by-laws of unincorporated associations where it is claimed and established that irregularity or illegality is involved. (See *Waldman* v. *Ladisky, supra,* and cases cited therein; *Polin* v. *Kaplan, supra,* and *Carey* v. *International Brotherhood, supra.*)

Despite the finding that the referendum was illegally conducted, a fundamental principle of equity must be considered. The defendants urge that by reason of plaintiff's laches, the relief sought should be denied.

The court finds that the delay in bringing this action has worked a prejudice or disadvantage to the defendants and more importantly, to the union membership. A change of position has taken place and necessary commitments have been made.

(*Feldman* v. *Metropolitan Life Ins. Co.*, 259 App. Div. 123 [1st Dept., 1940].)

The referendum was conducted in November, 1948. The election of the secretary-treasurer for a two-year term was held in June, 1949. Almost one year has passed since the incumbent, Rarback, took office. To order a new election would require such election to take place in June, 1950, in accordance with the by-laws of the district council as they existed prior to December 1, 1948. This action was instituted on March 17, 1950. Under the circumstances, the delay in instituting this action without adequate excuse, constitutes such laches as will require a court in an action in equity to deny relief. The affairs of a great union are involved. It has in excess of 8,500 members in the district council. To grant the relief demanded at this late date would not be an act of equity but an abetment of a tactical maneuver, hostile to the best interests of the membership, which by secret balloting elected the present administration. The evidence supports a finding that a June, 1950, election would create serious difficulties for the union, would not permit adequate preparation and may inject chaos into the leadership and organization.

There is no more established principle than that equity, as a prerequisite to its intervention, requires that a party shall have acted with reasonable promptness in presenting his claim for relief, having regard to the circumstances of the particular case. This doctrine of laches is a salutary one, designed to bar stale demands, the enforcement of which would result in inequity. (2 Pomeroy on Equity Jurisprudence [5th ed.], § 418 *et seq.*, p. 169 *et seq.*)

In *Calhoun* v. *Millard* (121 N. Y. 69) a representative action was brought in 1882 by certain taxpayers of a town against a railroad company, the town supervisor, and certain holders of bonds, issued by the town in 1871 to aid in the construction of the railroad. It was claimed the bonds were void because of irregularities attending their issuance and asked that the payment of interest thereon be stayed and that the bonds be deemed to be delivered up and cancelled. The court, after holding that the bonds were invalid, stated, at page 81, per ANDREWS, J.: "It is and always has been the practice of courts of equity to remain inactive where a party seeking their interference has been guilty of unreasonable laches in making his application (Story's Eq. Jur. § 1520.) The principle is stated with great force and clearness by Lord CAMDEN in *Smith* v. *Clay* (2 Ambl. 645):

' Nothing can call forth this court into activity but conscience, good faith and reasonable diligence. Where these are wanting the court is passive and does nothing. *Laches* and neglect are discountenanced and, therefore, from the beginning of this court, there was always a limitation to suits in this court.' " See to the same effect, *Groesbeck* v. *Morgan* (206 N. Y. 385) and *Seligson* v. *Weiss* (222 App. Div. 634, [1st Dept. 1928]).

The principle enunciated in the *Calhoun* case (*supra*) is particularly pertinent here. There, as in this case, the procedure followed resulted in invalid action; yet, where an inordinate lapse of time had intervened, coupled with change of position, before an attack was made upon it, equitable relief was withheld.

In view of the holding herein, it is unnecessary to pass on the questions of plaintiff's status as a member in good standing of the union, the timeliness or sufficiency of his protest or appeal within the union, or whether he has exhausted his remedies within the union.

Defendants' motions to dismiss the complaint are granted. Plaintiff's motion for judgment is denied. Settle judgment.